**HUMANITARIAN LAW PROJECT, et al., Plaintiffs,**

v.

**John ASHCROFT, et al., Defendants.**

**No. CV03–6107 ABC(MCX).**

United States District Court, C.D. California.

March 17, 2004.

---

Nancy Chung, Esq.; Center for Constitutional Rights, New York City, David Cole, Esq., Center for Constitutional Rights, Washington, DC, Paul Hoffman, Esq., Venice, CA, Visuvanathan Rudrakumaran, Esq., New York City, Carol Sobel, Esq., Santa Monica, CA, for Plaintiffs.

Sandra Schraibman, Esq.; John Tyler, Esq., U.S. Dept. of Justice, Washington, D.C., for Defendants.

## AMENDED ORDER RE: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO DISMISS

COLLINS, District Judge.

This action involves a challenge to the constitutionality of § 805(a)(2)(B) of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA PATRIOT Act") and §§ 302 and 303 of the Antiterrorism and Effective Death Penalty Act (the "AEDPA") which prohibit the provision of material support, including "expert advice or assistance," to designated foreign terrorist organizations. *See* § 805(a)(2)(B), 18 U.S.C. §§ 2339A(a) and 2339B(a). Plaintiffs seek to provide support for the lawful activities of two organizations that have been designated as "foreign terrorist organizations." Plaintiffs seek summary judgment and an injunction to prohibit Defendants from enforcing the criminal prohibition on providing "expert advice or assistance" to such organizations on the ground that, like the prohibitions on providing "training" and "personnel," which the Court previously enjoined, the prohibition is unconstitutionally vague and overbroad. *See Humanitarian Law Project v. Reno*, 9 F.Supp.2d 1176 (C.D.Cal.1998) (granting Plaintiffs' motion for preliminary injunction), *aff'd*, 205 F.3d 1130 (9th Cir.2000) and *Humanitarian Law Project v. Reno*, No CV 98–1971 ABC (BQRx), 2001 U.S. Dist. LEXIS 16729 (C.D.Cal.2001) (granting in part and denying in part Plaintiffs' motion for summary judgment and denying Defendants' motion to dismiss), *aff'd in part and rev'd in part*, 352 F.3d 382 (9th Cir.2003) (hereinafter referred to as *HLP I*).

Plaintiffs HUMANITARIAN LAW PROJECT, RALPH FERTIG, ILANKAI THAMIL SANGAM, DR. NAGALINGAM JEYALINGAM, WORLD TAMIL COORDINATING COMMITTEE, FEDERATION OF TAMIL SANGAMS OF NORTH AMERICA and TAMIL WELFARE AND HUMAN RIGHTS COMMITTEE (collectively, "Plaintiffs") now bring a Motion for Summary Judgment, and Defendants JOHN ASCHROFT (in his official capacity as United States Attorney General), the UNITED STATES' DEPARTMENT OF JUSTICE, COLIN POWELL (in his official capacity as Secretary of the Department of State) and the UNITED STATES DEPARTMENT OF STATE (collectively, "Defendants") bring a Motion to Dismiss. The Court found the motions appropriate for submission without oral argument. *See* Fed.R.Civ.P. 78; Local R. 7–15. Accordingly, the scheduled hearing date of January 12, 2004 was VACATED. After reviewing the materials submitted by the parties and the case file, the Court DENIES Defendants' motion to dismiss and GRANTS IN PART and DENIES IN PART Plaintiffs' motion for summary judgment.

## I. FACTUAL BACKGROUND

### A. The Regulatory Scheme

On October 26, 2001, Congress enacted the USA PATRIOT Act, which broadened the AEDPA's definition of "material support or resources" to add as a proscribed act the provision of "expert advice or assistance." As discussed in detail in *HLP I*, the AEDPA permits the Secretary of State, in consultation with the Secretary of

the Treasury and the Attorney General, to designate an organization as a foreign terrorist organization after making certain findings as to the organization's involvement in terrorist activity. *See* 8 U.S.C. § 1189(a)(1). "Terrorist activity" is defined as "an act which the actor knows, or reasonably should know, affords material support to any individual, organization, or government in conducting a terrorist activity at any time." 8 U.S.C. § 1182(a)(3)(B)(iii).

Section 303 of the AEDPA, as modified by Section 810 of the USA PATRIOT Act, provides: "Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life." 18 U.S.C. § 2339B(a). "Material support or resources" is defined as "currency or monetary instruments or financial securities, financial services, lodging, training, *expert advice or assistance,* safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." *Id.* § 2339A(b) (emphasis added).

### B. The Secretary's Designation

On October 8, 1997, then Secretary of State Madeline Albright designated 30 organizations as "foreign terrorist organizations" under the AEDPA. *See* 62 Fed. Reg. 52,649–51. The designated organizations included the Kurdistan Workers' Party, a.k.a. Partiya Karkeran Kurdistan,

a.k.a. PKK ("PKK") and the Liberation Tigers of Tamil Eelam, a.k.a. LTTE, a.k.a. Tamil Tigers, a.k.a. Ellalan Force ("LTTE").

### C. The Plaintiffs

Plaintiffs are five organizations and two United States citizens. Plaintiffs seek to provide support to the lawful, nonviolent activities of the PKK and the LTTE. Since October 8, 1997, the date on which the Secretary designated the PKK and the LTTE as foreign terrorist organizations, Plaintiffs, their members and individuals associated with the organizational Plaintiffs have not provided such support, fearing criminal investigation, prosecution and conviction.

#### 1. *The PKK and the Plaintiffs that Support It*

The PKK, the leading political organization representing the interests of the Kurds in Turkey, was formed approximately 25 years ago with the goal of achieving self-determination for the Kurds in Southeastern Turkey. It is comprised primarily of Turkish Kurds. Plaintiffs allege that for more than 75 years, the Turkish government has subjected the Kurds to human rights abuses and discrimination. The PKK's efforts on behalf of the Kurds include political organizing and advocacy both inside and outside Turkey, providing social services and humanitarian aid to Kurdish refugees and engaging in military combat with Turkish armed forces in accordance with the Geneva Convention and Protocols.

Two Plaintiffs, Humanitarian Law Project ("HLP") and Administrative Judge Ralph Fertig,[1] HLP's President, seek to support the PKK's peaceful and non-vio-

---

1. Although Judge Fertig was an administrative judge for the United States Equal Employment Opportunity Commission until his recent retirement, he sues solely in his personal capacity.

lent activities. The HLP, a not-for-profit organization headquartered in Los Angeles, is dedicated to furthering international compliance with humanitarian law and human rights law and the peaceful resolution of armed conflicts.[2]

The HLP has consultative status to the United Nations ("UN") as a non-governmental organization and regularly participates in meetings of the UN Commission on Human Rights in Geneva, Switzerland. The HLP conducts fact-finding missions, writes and publishes reports, and works for the peaceful resolution of armed conflicts around the world.

Judge Fertig has a career of over 50 years in human rights work. He has been a member of the HLP's Board of Directors since 1989, serving as President from 1993 to 1995 and from 1997 to the present. He has participated in HLP delegations that have investigated alleged human rights violations in Turkey, Mexico, and El Salvador, has written reports for the HLP, and has trained others in the use of international human rights law and other lawful means for the peaceful resolution of disputes.

Since 1991, the HLP and Judge Fertig have devoted substantial time and resources advocating on behalf of the Kurds living in Turkey and working with and providing training, expert advice and other forms of support to the PKK. Judge Fertig and other individuals associated with the HLP have conducted fact-finding investigations on the Kurds in Turkey and have published reports and articles presenting their findings, which are supportive of the PKK and the struggle for Kurdish liberation. They assert that the Turkish government has committed extensive human rights violations against the Kurds, including the summary execution of more than 18,000 Kurds, the widespread use of arbitrary detentions and torture against persons who speak out for equal rights for Kurds or are suspected of sympathizing with those who do, and the wholesale destruction of some 2,400 Kurdish villages. Applying international law principles, they have concluded that the PKK is a party to an armed conflict governed by Geneva Conventions and Protocols and, therefore, is not a terrorist organization under international law.

To further peaceful resolutions of the armed conflict in Turkey and protect the human rights of the Kurds, the HLP, Judge Fertig, and other individuals associated with the HLP have worked with and supported the PKK in numerous ways. They have petitioned members of Congress to support Kurdish human rights and to encourage negotiations between the PKK and the Turkish government. They have argued for the release of Leyla Zana, Hatip Dicle, Orhan Dogan, and Selim Sadak, four Kurds who were elected to the Turkish Parliament in 1991, but sentenced to 15 years in prison by the Turkish courts for being members or supporters of the PKK. In addition, the HLP, Judge Fertig, and other individuals associated with the HLP have provided training to some PKK members and other Kurds in using humanitarian law and international human rights law and in seeking a peaceful resolution of the conflict in Turkey. Both the HLP and Judge Fertig only support the PKK in its non-violent and lawful activities.

Since the Secretary designated the PKK as a foreign terrorist organization, the

---

2. The HLP was absorbed by the International Educational Development, Inc. ("IED") in 1989. The HLP is sometimes referred to as the International Educational Development, Inc. *Humanitarian Law Project ("IED*HLP"). The IED was formed in the 1950's by a group of Jesuit Fathers to conduct non-sectarian work to aid schools, hospitals, and impoverished third world communities.

HLP and Judge Fertig have been deterred from continuing to assist the PKK to improve conditions for the Kurds living in Turkey. But for the AEDPA and the USA PATRIOT Act, they would continue to provide the type of support which they provided in the past, as well as additional support. However, they fear that doing so would subject them to criminal prosecution.

The HLP, Judge Fertig, and individuals associated with the HLP would specifically like to, but are afraid to, provide support to the PKK in the following ways:

(1) engage in political advocacy on behalf of the PKK and the Kurds before the U.N. Commission on Human Rights and the United States Congress;

(2) provide the PKK and the Kurds with training and written publications on how to engage in political advocacy on their own behalf and on how to use international law to seek redress for human rights violations;

(3) write and distribute publications supportive of the PKK and the cause of Kurdish liberation;

(4) advocate for the freedom of Turkish political prisoners, including Leyla Zana, Hatip Dicle, Orhan Dogan, and Selim Sadak; and

(5) assist PKK members at peace conferences and other meetings designed to support a peaceful resolution of the Turkish conflict.

HLP and Judge Fertig are committed to providing the above-mentioned support. However, they are afraid that the conduct in which they have engaged and in which they wish to continue to engage may come within the scope of "expert advice or assistance." Since the enactment of the USA PATRIOT ACT and the amendment of the term "material support" to include "expert advice or assistance," the HLP and Judge Fertig have refrained from providing this advice and assistance for fear that they may be subjected to criminal prosecution.

### 2. The LTTE and the Plaintiffs that Support It

The LTTE was formed in 1976 with the goal of achieving self-determination for the Tamil residents of Tamil Eelam, in the Northern and Eastern provinces of Sri Lanka. Plaintiffs allege that the Tamils constitute an ethnic group that has for decades been subjected to human rights abuses and discriminatory treatment by the Sinhalese, who have governed Sri Lanka since the nation gained its independence from Great Britain in 1948. The Sinhalese constitute a numerical majority of Sri Lanka's population.

Plaintiffs allege that the LTTE, to further its goal of self-determination for the Tamils, engages in: (1) political organizing and advocacy; (2) diplomatic activity; (3) the provision of social services and humanitarian aid; (4) the establishment of a quasi-governmental structure in Tamil Eelam; (5) economic development; (6) defense of the Tamil people from human rights abuses; and (7) military struggle against the government of Sri Lanka.

Five Plaintiffs—four membership organizations and an individual—seek to provide support to the LTTE. These Plaintiffs are committed to the human rights and well-being of the Tamils in Sri Lanka. Many members of these organizations and the individual Plaintiff, Dr. Nagalingam Jeyalingam, are Tamils born in Sri Lanka. Although they now reside in the United States and many are United States citizens, they still have close friends and family members living in Sri Lanka, many of whom have been the victims of alleged abuses by the Sri Lankan government.

### a. *Ilankai Thamil Sangam*

Plaintiff Ilankai Thamil Sangam ("Sangam"), a New Jersey not-for-profit corporation founded in 1977 has approximately 135 members, most of whom are Tamils born in Sri Lanka. The Sangam's objectives are to promote the association of Tamils in the New York City metropolitan area, to promote knowledge of the Tamil language, culture, and heritage, and to provide humanitarian assistance to the Tamils in Sri Lanka, especially those who are refugees and orphans as a result of the political strife in Sri Lanka.

The Sangam and its members, many of whom are physicians, wish to offer their expert medical advice and assistance to the LTTE by consulting with the LTTE on how the health care system in Tamil Eelam can be improved and by volunteering their advice and assistance to hospitals and medical centers in LTTE-controlled areas, some of which are run by the LTTE. Neither the Sangam nor its members seek to support any military or unlawful activities of the LTTE. The Sangam and its members have been deterred from providing the above-described advice and assistance because of fear of criminal investigation, prosecution and conviction.

### b. *Dr. Nagalingam Jeyalingam*

Plaintiff Dr. Nagalingam Jeyalingam is a naturalized United States citizen who is a Tamil from Sri Lanka. He is a surgeon with specialized training in otolaryngology, was President of Sangam from 1995 to 1997 and is currently an active member. Members of Dr. Jeyalingam's family, including his mother, brothers, and sisters, were displaced from their homes and forced to flee from Sri Lanka to India as refugees in 1983.

Dr. Jeyalingam traveled to the Tamil Eelam region in April of 2002, several months after the LTTE and the Sri Lankan government entered into a cease fire. During his travels, he visited a hospital run by the LTTE and observed first-hand the lack of trained physicians. Dr. Jeyalingam would like to return to the region in order to consult with and provide the LTTE his expert advice on how to improve the delivery of health care, with a special focus on otolaryngology, and to provide his services as an otolaryngology specialist for a period of six months or longer. Dr. Jeyalingam has been deterred from doing so because he fears he may be subjected to criminal prosecution for providing "expert advice or assistance."

### c. *World Tamil Coordinating Committee*

Plaintiff World Tamil Coordinating Committee (the "WTCC"), an organization based in Jamaica, New York, and its members wish to provide expert advice and assistance to the LTTE toward the goals of achieving normalcy in war-torn Tamil Eelam and negotiating a permanent peace agreement between the LTTE and the Sri Lankan government. The WTCC and its members have expertise in the fields of politics, law and economic development and wish to provide expert advice and assistance in these fields. Since the enactment of the USA PATRIOT Act, the WTCC and its members have been afraid to provide this expert advice and assistance for fear of criminal prosecution.

### d. *Federation of Tamil Sangams of North America*

Plaintiff Federation of Tamil Sangams of North America ("FETNA") is a nonprofit corporation founded in 1986. FETNA's membership includes 30 Sangams in the United States, including Ilankai Thamil Sangam. The FETNA member Sangams are comprised mainly of United States citizens and legal permanent residents who are ethnic Tamils from all over

the world, including India and Sri Lanka. FETNA's purposes are to encourage appreciation of Tamil language, literature, arts, cultural heritage and history, and friendship among the Tamils and the Tamil Sangams around the world.

FETNA, its member Sangams, and its individuals members would like to provide their expert advice and assistance in the fields of Tamil language, literature, arts, cultural heritage, and history to the Tamils in the Tamil Eelam region, which is under the control of the LTTE, by developing school curricula, teaching these subjects and rebuilding Tamil Eelam's libraries and arts programs. In order for the FETNA and its members to do this, they would be required to work in coordination with the LTTE, which controls the infrastructure in Tamil Eelam. They are afraid, however, of being criminally prosecuted for doing so.

### e. *Tamil Welfare and Human Rights Committee*

Finally, Plaintiff Tamil Welfare and Human Rights Committee ("TWHRC") is a Maryland association of approximately 100 Tamils, both United States citizens and non-citizens. Its primary objectives are to protect the human rights of the Tamils in Sri Lanka and to promote their health, social well-being, and welfare. The TWHRC and its members have expertise in the fields of economic development and information technology and wish to provide the LTTE with expert advice and assistance in these fields towards the goal of promoting civil peace and stability in the lives of the Tamils of Tamil Eelam. Because of the USA PATRIOT Act, however, the TWHRC and its members have been deterred from doing do for fear of criminal prosecution. The TWHRC seeks only to support the LTTE's humanitarian efforts and does not seek to support the LTTE's military activities.

## II.  PROCEDURAL HISTORY

In a related suit filed in March of 1998 by Plaintiffs challenging the AEDPA's material support provision, this Court granted an injunction prohibiting prosecution of Plaintiffs for providing "training" and "personnel" on the grounds that the terms were unconstitutionally vague. *See HLP I*, 9 F.Supp.2d 1176 (C.D.Cal.1998) (granting Plaintiffs' motion for preliminary injunction), *aff'd*, 205 F.3d 1130 (9th Cir. 2000); *Humanitarian Law Project v. Reno*, No. CV 98–1971 ABC (BQRx), 2001 U.S. Dist. LEXIS 16729 (C.D.Cal.2001) (granting in part and denying in part Plaintiffs' motion for summary judgment and denying Defendants' motion to dismiss), *aff'd in part and rev'd in part*, 352 F.3d 382 (9th Cir.2003).

On August 27, 2003, Plaintiffs filed their Complaint against Defendants alleging the following three causes of action:

(1) Section 805(a)(2)(B) of the USA PATRIOT ACT violates the First Amendment's guarantees to freedom of speech and association and to petition the government for a redress of grievances insofar as it criminalizes the provision of "expert advice and assistance" to designated foreign terrorist organizations without a specific intent to further the organization's unlawful ends;

(2) Sections 302 and 303 of the AEDPA and Section 805(a)(2)(B) of the USA PATRIOT Act violate the First and Fifth Amendments by granting the Secretary of State unreviewable authority to designate foreign organizations as terrorist organizations and prohibit the provision of "expert advice and assistance," which invite impermissible viewpoint discrimination targeting particular groups and their supporters based on their political views; and

(3) Section 805(a)(2)(B) of the USA PA-TRIOT Act violates the First and Fifth Amendment because its prohibition of "expert advice and assistance" is impermissibly vague and substantially overbroad, fails to provide adequate notice of prohibited activity, gives government officials unfettered discretion in enforcement, and causes individuals to avoid protected First Amendment activity in order to steer clear of the prohibited conduct.

Plaintiffs seek a preliminary and permanent injunction barring enforcement against Plaintiffs of the USA PATRIOT Act's prohibition of the provision of "expert advice or assistance" to a designated foreign terrorist organization absent a specific intent to further the organization's unlawful terrorist activities. Plaintiffs also seek an order declaring the prohibition of the provision of "expert advice or assistance" unconstitutional as applied to Plaintiffs' conduct because it violates the First and Fifth Amendments by criminalizing the act of providing expert advice or assistance to designated foreign terrorist organizations without requiring a showing of specific intent to further the organization's unlawful terrorist activities, and by doing so in an impermissibly vague and overbroad manner.

On October 16, 2003, Plaintiffs filed the instant motion for summary judgment, in which they seek summary judgment and a permanent injunction against enforcement of the "expert advice or assistance" provision of the USA PATRIOT Act, as well as summary judgment on their other claims. Defendants filed their memorandum in opposition to Plaintiffs' motion and in support of their motion to dismiss on November 24, 2003. On December 8, 2003, Plaintiffs filed their reply in support of their motion and in opposition to Defen-

dants' motion to dismiss. Defendants filed their reply on December 15, 2003.

## III. LEGAL STANDARDS

### A. Motion to Dismiss for Lack of Justiciability

Defendants move to dismiss Plaintiffs' challenge to the "expert advice or assistance" provision for lack of justiciability. They maintain that the case raises issues of both standing and ripeness.

A motion to dismiss will be denied unless it appears that the plaintiff can prove no set of facts which would entitle him or her to relief. *See Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246 (9th Cir.1997). All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986).

### 1. *Standing*

■ Standing is a threshold requirement in every federal case. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "As an aspect of justiciability, the standing question is whether the plaintiff has alleged such a personal stake in the controversy as to warrant [plaintiffs'] invocation of federal court jurisdiction." *MAI Sys. Corp. v. UIPS*, 856 F.Supp. 538, 540 (N.D.Cal.1994) (citation omitted). The "three separate but interrelated components" of Article III standing are: (1) a distinct and palpable injury to the plaintiff; (2) a fairly traceable causal connection between the injury and challenged conduct; and (3) a substantial likelihood that the relief requested will prevent or redress the injury. *Id.* (citing *McMichael v. County of Napa*, 709 F.2d 1268, 1269 (9th Cir.1983)).

## 2. *Ripeness*

■ Ripeness is "peculiarly a question of timing," *Regional Rail Reorg. Act Cases,* 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In the context of a claimed threat of prosecution, courts are to consider whether the plaintiffs face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), "look[ing] to whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past persecution or enforcement under the challenged statute." *Thomas,* 220 F.3d at 1139 (quoting *San Diego County Gun Rights Comm. v. Reno,* 98 F.3d 1121, 1126–27 (9th Cir.1996)). If these requirements are met, the Court is also to consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507.

## B. Motion for Summary Judgment

Summary judgment shall be granted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. 56(c). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [its] own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party discharges its burden by showing that the nonmoving party has not disclosed the existence of any "significant probative evidence tending to support the complaint." *First National Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The Court views the inferences drawn from the facts in the light most favorable to the party opposing the motion. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir.1987).

## IV. DISCUSSION

### A. Defendants' Motion to Dismiss.

Defendants move to dismiss Plaintiffs' challenge to the provisions regarding "expert advice or assistance," arguing that Plaintiffs' pre-enforcement challenge is not justiciable on the basis of both standing and ripeness.[3] Plaintiffs oppose the Government's motion, arguing that their claims are justiciable because they face a credible threat of prosecution.

---

**3.** "Sorting out where standing ends and ripeness begins is not an easy task .... [I]n 'measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with stand-ing.'" *Thomas v. Anchorage Equal Rights Commission,* 220 F.3d 1134, 1138–39 (9th Cir.2000) *(en banc)* (quoting Gene R. Nichol, Jr., *Ripeness and the Constitution,* 54 U. Chi. L.Rev. 153, 172 (1987)).

"To satisfy the Article III case or controversy requirement, [a plaintiff] must establish, among other things, that it has suffered a constitutionally cognizable injury-in-fact." *California Pro–Life Council, Inc. v. Getman,* 328 F.3d 1088, 1093 (9th Cir.2003). "[N]either the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Thomas v. Anchorage Equal Rights Commission,* 220 F.3d 1134, 1139 (9th Cir.2000) (*en banc*). Instead, there must be a "genuine threat of imminent prosecution." *Id.* "In evaluating the genuineness of a claimed threat of prosecution, [the Ninth Circuit considers] whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.*

■ Defendants contend that the above-referenced factors support dismissal of Plaintiffs' claims on the basis of standing and ripeness, because Plaintiffs have failed to demonstrate (1) a history of prosecution under the relevant provision of the USA PATRIOT Act, or any threat of prosecution directed toward Plaintiffs or (2) that they have a "concrete plan" to violate the law in question, or that their intended conduct might arguably come within the statute's reach. Defendants also argue that Plaintiffs' 18–month delay in seeking relief also weighs against a finding of justiciability. Finally, Defendants attempt to divide Plaintiffs into two categories. Defendants argue that the Plaintiffs in the first category, which comprises the majority of Plaintiffs, do not fall within the scope of the statute because the advice and assistance they seek to provide is not "expert." Defendants concede that the Plaintiffs in the second category, comprised of Dr. Nagalingam Jeyalingam, and "to a lesser extent," Ilankai Thamil Sangam, seek to provide services that at least arguably fall within the statute's reach. However, Defendants claim that like the other Plaintiffs, the failure of Dr. Jeyalingam and of Sangam to identify a "concrete plan" to violate the law at issue is fatal to their claims. Based on the foregoing, Defendants conclude that Plaintiffs have failed to meet their burden in demonstrating an injury-in-fact in support of Article III ripeness or standing, and their claims should therefore be dismissed for lack of justiciability.

In their opposition, Plaintiffs contend that the threat of prosecution they face is credible because (1) the government has rigorously enforced the material support provision in the wake of September 11, 2001, (2) the government has specifically identified the LTTE and PKK as terrorist organizations, (3) prior to their designation as terrorist organizations, Plaintiffs provided support to the LTTE and PKK and (4) Defendants have never suggested that Plaintiffs' intended support was lawful and thus not subject to prosecution. In Plaintiffs' view, these facts are sufficient to establish a credible threat of prosecution and their standing to bring suit based upon that threat.

With respect to Defendants' contention that the advice and assistance Plaintiffs seek to offer (with the exception of medical advice and assistance) is not even arguably expert, Plaintiffs refer to their supplemental affidavits, which identify their expertise in the fields of (1) international human rights, peacemaking and advocacy (HLP and Judge Ralph Fertig), (2) information technology and economic development (TWHRC), (3) law and telecommunications (WTCC) and (4) Tamil language, literature, arts, cultural heritage and history (FETNA). In Plaintiffs' view, it is undisputable that Plaintiffs' activities are at least "arguably covered" by the prohibi-

tions on the provision of "expert advice or assistance."

Plaintiffs also assert that they have sufficiently identified "concrete plans" which are specific as to the groups they seek to support and the type of expert advice and assistance they seek to provide, and that their past activities underscore that these plans are not merely abstract desires. Specifically, Plaintiffs HLP and Judge Fertig would encourage the PKK and its affiliate and successor groups "to pursue peace and human rights advocacy" by (1) assisting members of the PKK in participating in delegations and making presentations to the United Nations Human Rights Subcommission, (2) working with the UN Subcommission on Human Rights on behalf of the Kurds of Turkish-occupied Kurdistan and (3) providing training to PKK members to help them bring claims before legislative bodies and the United Nations. (12/7/03 Declaration of Judge Ralph Fertig ¶ 5.) Plaintiffs Dr. Jeyalingam and the physician members of Sangam would offer medical advice and assistance to the physicians and health care professionals of the Tamil Eelam region of Sri Lanka by (1) seeking to identify the health needs of the region, (2) assessing how those needs can be met, (3) raising the level of education for physicians and other health care professionals, (4) developing plans for modernizing the delivery of health care in the region, and (5) improving services provided at LTTE-run hospitals. (12/7/03 Declaration of Tharmarajah Pathmakumar ¶ 3; 12/7/03 Declaration of Dr. Jeyalingam ¶ 4.) Plaintiff WTCC and its members wish to provide the LTTE with expert advice and assistance in the areas of law, politics and economic development in order to negoti-

ate a permanent peace agreement between the LTTE and the Sri Lankan government and achieve normalcy in the Tamil Eelam region. (9/8/03 Declaration of Amirthalingam Jeyakumar ¶ 3.) Plaintiff FETNA and its members wish to use their expertise in Tamil language, literature, arts, cultural heritage and history by (1) developing school curricula in these subjects, (2) teaching these subjects in Tamil Eelam's schools and (3) rebuilding Tamil Eelam's libraries and arts programs. (9/9/03 Declaration of Karuppiah Sivaraman ¶ 3.) Plaintiff TWHRC seeks to provide expert advice and assistance (1) in the field of information technology by teaching students in LTTE-controlled Tamil Eelam how to utilize computer equipment and desktop publishing software and (2) in the field of economic development, to assist in the development of sound economic plans that will encourage an infusion of capital in the region. (12/7/03 Declaration of Muthuthamby Sreetharan ¶¶ 3–4.) In Plaintiffs' estimate, the foregoing is sufficient to satisfy the "concrete plan" requirement of *California Pro–Life Council* and *Thomas.*

Plaintiffs also seek to discount Defendants' emphasis on the 18–month delay in filing a challenge to the "expert advice or assistance" provision, arguing that there is no requirement that a party challenge a statute as soon as it is enacted, and citing a number of Ninth Circuit cases in which pre-enforcement challenges were entertained long after the enactment of the statutes.[4]

Having carefully considered the parties' arguments and the applicable law, the Court finds that Defendants' motion to dismiss for lack of justiciability must be

---

4. *See, e.g., Bland v. Fessler,* 88 F.3d 729 (9th Cir.) (pre-enforcement challenge filed four years after statute's enactment), *cert. denied,* 519 U.S. 1009, 117 S.Ct. 513, 136 L.Ed.2d 403 (1996); *Adult Video Ass'n v. Barr,* 960

F.2d 781 (9th Cir.1992) *vacated sub nom.,* 509 U.S. 917, 113 S.Ct. 3028, 125 L.Ed.2d 716, *reinstated in relevant part,* 41 F.3d 503 (9th Cir.1994) (pre-enforcement challenge filed five years after statute's enactment).

denied. As set forth above, the relevant factors to consider in determining whether Article III requirements have been satisfied are (1) whether the plaintiffs have articulated a "concrete plan" to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute.

With respect to the articulation of a concrete plan, the Court finds that Plaintiffs have satisfied their burden. While "[a] general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan[,]" *Thomas,* 220 F.3d at 1139, Plaintiffs here have identified more than a "hypothetical intent to violate the law." *Id.* Unlike the plaintiffs in *Thomas,* who claimed that they had violated the law in the past and intended to do so in the future, but were unable to specify "when, to whom, where, or under what circumstances," *ibid.,* the Plaintiffs in the instant case have articulated that they (1) have provided services in the past and would do so again if the fear of criminal prosecution were removed, and have in some cases identified the duration of time for which their services would be provided, (2) seek to assist the PKK and the LTTE (as well as Tamils in LTTE-controlled Tamil Eelam), (3) wish to provide this assistance in this country, through advocacy, as well as in Sri Lanka and Turkish-controlled Kurdistan and (4) would provide these services as needed, in many cases immediately. These plans are markedly different from the intent of the *Thomas* landlords to violate the law "on some uncertain day in the future." *Id.* at 1140. The Court therefore finds that the first prong has been met.

Second, the Court finds that Plaintiffs have sufficiently demonstrated a threat of prosecution. As the Ninth Circuit indicated in *California Pro–Life Council,* "[p]articularly in the First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements." 328 F.3d at 1094. "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Id.,* citing *Ariz. Right to Life Political Action Comm. v. Bayless,* 320 F.3d 1002, 1006 (9th Cir.2003). While recognizing that the "self-censorship door to standing" is not available for every plaintiff, fear of prosecution in the free speech context inures "if the plaintiff's intended speech arguably falls within the statute's reach." *Id.* at 1095.

While Defendants are correct that the record does not demonstrate that Plaintiffs have yet been subjected to prosecution for their activities, it is clear under *California Pro–Life Council* that this is not required in the free speech context. The PKK and the LTTE have been designated as foreign terrorist organizations, thus putting Plaintiffs on notice that provision of expert advice and assistance may subject them to criminal prosecution. The question is thus whether Plaintiffs' intended speech-related activities arguably fall within the statute's reach. Defendants concede that the medical expertise at least arguably falls within the reach of the statute, but contend that none of the other areas of expertise identified by Plaintiffs are actually "expert." The Court disagrees. Judge Fertig and HLP have set forth ample support of their asserted expertise in international human rights, peacemaking and advocacy, TWHRC has identified at least two of its members with significant expertise and training in information technology and software development, WTCC has identified three members with expertise in the

law and in telecommunications, and FET-NA has identified at least two members with significant expertise in Tamil culture. For purposes of satisfying the standing requirements of Article III, the Court finds that these Plaintiffs have demonstrated that their speech at least arguably falls within the scope of the statute.

Third, Plaintiffs have sufficiently demonstrated a history of enforcement under the challenged statute, something which Defendants do not contest in their motion or reply. Unlike the statute in *Thomas,* for which there was not a single instance of criminal prosecution in the 25 years it had been in effect, the government has been active in its enforcement of the USA PATRIOT Act. The Court therefore finds that this prong weighs in favor of a finding of Article III standing.

Finally, the Court agrees with Plaintiffs that the delay in initiating the instant action is not fatal to a finding of standing or ripeness. Defendants have identified no legal requirement that a pre-enforcement challenge be filed within a set amount of time after a statute's enactment, and the Court finds, in light of *Bland v. Fessler* and *Adult Video Ass'n v. Barr* that this delay is not determinative.

Based on the foregoing, Defendants' Motion to Dismiss for lack of justiciability is hereby DENIED in its entirety.

### B. Plaintiffs' Motion for Summary Judgment.

Plaintiffs bring their motion for summary judgment on several grounds. First, they argue that the prohibition on providing expert advice and assistance is both impermissibly vague and substantially overbroad. Second, they contend that prohibition violates the First and Fifth Amendments by criminalizing associational speech without proof of intent to incite imminent violence or to support a group's illegal ends. Finally, they assert that the prohibition on providing expert advice and assistance violates the First and Fifth Amendments because it grants the Secretary of State unreviewable authority to designate groups as foreign terrorist organizations.

Defendants oppose Plaintiffs' motion, asserting that Plaintiffs' First and Fifth Amendment claims are meritless because (1) the statute is not vague under the Fifth Amendment or in relation to Plaintiffs' own conduct, (2) under *Virginia v. Hicks,* Plaintiffs' facial First Amendment overbreadth challenge must fail, and (3) the USA PATRIOT Act does not regulate advocacy or association with terrorist groups. Defendants also assert that the Court previously rejected Plaintiffs' arguments with respect to regulation of association and the unreviewable authority given to the Secretary of State in *HLP I,* and that these arguments need not be revisited here.

  1. *Plaintiffs Have Demonstrated that the Prohibition is Impermissibly Vague but Have Failed to Demonstrate that the Prohibition is Substantially Overbroad.*

Plaintiffs first argue that the term "expert advice or assistance" is at least as vague as "training" and "personnel," the enforcement of which has been enjoined on constitutional grounds. *See HLP I.* Plaintiffs also contend that the prohibition is overbroad, because it prohibits a substantial amount of speech activity that is clearly protected by the First Amendment.

  a. *Plaintiffs Have Demonstrated that the Prohibition is Impermissibly Vague.*

■ A challenge to a statute based on vagueness grounds requires the Court to consider whether the statute is sufficiently clear so as not to cause persons " 'of common intelligence ... necessarily [to] guess

at its meaning and [to] differ as to its application.'" *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir.1996) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). Vague statutes are void for three reasons: "(1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir.1998) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)).

■ "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). "The requirement of clarity is enhanced when criminal sanctions are at issue or when the statute abuts upon sensitive areas of basic First Amendment freedoms." *Information Providers' Coalition for the Defense of the First Amendment v. FCC*, 928 F.2d 866, 874 (9th Cir.1991) (quotation omitted). Thus, under the Due Process Clause, a criminal statute is void for vagueness if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss*, 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

■ The determinative issue is thus whether the USA PATRIOT Act sufficiently identifies the prohibited conduct. Plaintiffs contend that the term "expert advice or assistance" is at least as vague as the terms "training" and "personnel," which the Court previously held to be vague as applied to Plaintiffs. To support this contention, Plaintiffs cite the definitions of "expert," "advice" and "assistance" to show that (1) "expert" fails to identify the types of activities which may or may not be undertaken, (2) "advice" is virtually synonymous with "training," (3) "assistance," which is potentially broader than "advice," could encompass nearly any human resources support, and (4) although the modifier "expert" makes the ban on advice and assistance less broad than the ban on the provision of "personnel," it is still similar to, and potentially broader than, the ban on "training."

In addition to the foregoing, Plaintiffs argue that the prohibition conceivably encompasses any activity that may provide counsel or aid, regardless of intent, including many activities protected by the First Amendment, *e.g.*, instructing designated groups how to petition the United Nations and advocating for a designated group. Plaintiffs assert that certain expert advice and assistance, which they believe to be protected by the First Amendment, could potentially be barred by the USA PATRIOT Act. Specifically, (1) HLP seeks to assist the PKK by advocating on its behalf and advising it on international law and the art of peacemaking and negotiation; (2) physician members of Sangam and Dr. Jeyalangim wish to provide expert medical advice and assistance to improve the delivery of health care in LTTE-controlled regions of Sri Lanka; (3) TWHRC members seek to provide expertise to the LTTE in the fields of economic development and information technology; (4) WTCC members seek to provide legal expertise to the LTTE in negotiating a peace agreement with the Sri Lankan government and establishing a legal and political framework that will embrace democratic values and

promote the rule of law in Tamil Eelam and to provide telecommunications expertise to the LTTE in disseminating news on the progress of the peace developments; and (5) FETNA members seek to provide expert advice and assistance to the LTTE in order to improve the cultural life and schools in Tamil Eelam. Plaintiffs claim that they are fearful that participating in these activities would constitute providing expert advice or assistance to foreign terrorist organizations, for which they would be subject to criminal prosecution.

In their opposition, Defendants argue that the definitions of "expert," "advice" and "assistance" are clear, as is Congress's intent to deny foreign terrorist groups expert skills, whether in the flying of jet aircraft, the raising of funds or the manufacture of weapons. Defendants also claim that the statute does not prohibit either (1) advocacy on behalf of terrorist organizations or their causes or (2) association with those organizations in furtherance of their advocacy goals. With the exception of these activities, in Defendants' view, the statute gives "fair warning" that it prohibits the provision of *any* expert advice or assistance to terrorist organizations.

Defendants next argue that the law is not vague in relation to Plaintiffs' own conduct, because it puts them on notice that the provision of medical services is barred, as is the provision of expert advice or assistance on economic development or human rights advocacy.[5] Thus, in Defendants' view, Plaintiffs' argument that the prohibition is impermissibly vague must fail.

In their reply, Plaintiffs first point out that Defendants' opposition entirely fails to articulate how the term "expert advice or assistance" is less vague than "training" and "personnel." They also note that Defendants appear to contradict themselves, by asserting that the ban does not prohibit advocacy of foreign terrorist organizations but does preclude the provision of any expert advice or assistance, including associational activity which might be construed as expert advice or assistance, which Plaintiffs contend could potentially include HLP's intended assistance to the PKK in the fields of training in human rights advocacy and peacemaking. Plaintiffs conclude based on this that the term "expert advice or assistance" is void for vagueness for the same reasons the Court previously found the terms "training" and "personnel" to be impermissibly vague.[6]

Having considered the parties' arguments and the relevant law, including the rulings in *HLP I*, the Court concludes that the term "expert advice or assistance," like the terms "training" and "personnel," is not "sufficiently clear so as to allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Foti*, 146 F.3d at [638] (quoting *Grayned*, 408 U.S. at 108, 92 S.Ct. 2294). Defendants have failed to adequately distinguish the provision of "expert advice or assistance" from the provision of "training" or "personnel" in a way that allows the Court to reconcile its prior finding that the terms "training" and "personnel" are impermissibly vague, with a finding that the term "expert advice or assistance" is not.

---

5. Defendants do not address whether this prohibition extends to the provision of advice and assistance in the field of information technology, although presumably such activity is also barred by the statute.

6. Defendants raise additional arguments in opposition to Plaintiffs' motion for summary judgment in their reply in support of their own motion to dismiss. To the extent that these arguments constitute an improper surreply, the Court has disregarded them. The Court also notes that Defendants' arguments on this issue conflict with the Ninth Circuit's recent decision.

Furthermore, Defendants' contradictory arguments on the scope of the prohibition underscore the vagueness of the prohibition. The "expert advice or assistance" Plaintiffs seek to offer includes advocacy and associational activities protected by the First Amendment, which Defendants concede are not prohibited under the USA PATRIOT Act. Despite this, the USA PATRIOT Act places no limitation on the type of expert advice and assistance which is prohibited, and instead bans the provision of *all* expert advice and assistance regardless of its nature. Thus, like the terms "personnel" and "training," "expert advice or assistance" "could be construed to include unequivocally pure speech and advocacy protected by the First Amendment" or to "encompass First Amendment protected activities." 352 F.3d 382, 404 (9th Cir.2003).

Based on the foregoing, the Court finds that Plaintiffs have satisfied their burden on their claim that the term "expert advice or assistance" is impermissibly vague, and concludes that Plaintiffs are entitled to injunctive relief.[7]

b. *Plaintiffs Have Failed to Demonstrate that the Prohibition is Substantially Overbroad.*

"The First Amendment doctrine of overbreadth is an exception to [the] normal rule regarding the standards for facial challenges." *Virginia v. Hicks,* 539 U.S. 113, 123 S.Ct. 2191, 2196, 156 L.Ed.2d 148 (2003). Under the overbreadth doctrine, a "showing that a law punishes a 'substantial' amount of protected free speech

judged in relation to the statute's plainly legitimate sweep ... suffices to invalidate *all* enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Id.* (internal citations and quotations omitted.)

Despite the foregoing, the Supreme Court has recognized that "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law-particularly a law that reflects legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Id.* at 2197. "To ensure that [the substantial social costs created by the overbreadth doctrine] do not swallow the social benefits of declaring a law 'overbroad,'" the Supreme Court requires that the "law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications before applying the 'strong medicine' of the overbreadth invalidation." *Id.*

■ In their motion, Plaintiffs contend that the term "expert advice or assistance" is substantially overbroad because it prohibits a substantial amount of speech activity which is clearly protected by the First Amendment, such as training in human rights advocacy, giving advice on how to improve medical care and education, and distributing human rights literature. Defendants oppose, arguing that Plaintiffs

---

7. The Ninth Circuit recently construed 18 U.S.C. § 2339B "to require the government to prove that a person acted with knowledge of an organization's designation as a 'foreign terrorist organization' or knowledge of the unlawful activities that caused the organization to be so designated." 352 F.3d 382, 393–94 (9th Cir.2003). Although the Ninth Circuit's ruling in *HLP I* clarifies the statute's

scienter requirement with respect to non-First Amendment protected activities, it does not mitigate a finding of vagueness with respect to those activities that fall within the scope of the First Amendment. *See id.* at 403 (affirming this Court's ruling that the terms "personnel" and "training" are impermissibly vague "because they bring within their ambit constitutionally protected speech and advocacy.")

have failed to meet their burden in showing that substantial overbreadth exists, as required by *Virginia v. Hicks*. In Defendants' view, Plaintiffs have offered no examples of core political activities barred by the statute, and the examples they have provided fall short of demonstrating that the statute prohibits a substantial amount of speech in either an absolute sense or in relation to the law's legitimate applications.

With respect to the physician members of Sangam and Dr. Jeyalangim, Defendants contend that the prohibition on providing medical aid and advice survives First Amendment scrutiny because (1) the practice of medicine is subject to reasonable licensing and regulation, (2) the government has the authority to restrict the dealings of United States citizens with foreign entities and (3) the prohibition is not aimed at interfering with the expressive component of Plaintiffs' intended conduct.[8]

In addition, Defendants argue that Plaintiffs cannot demonstrate overbreadth from the statutory text itself. In Defendants' view, while the statute might at the fringes apply to protected speech, this is insufficient to block its legitimate applications. To succeed, Plaintiffs must demonstrate that the law's application is substantial both in an absolute sense and relative to the scope of the law's legitimate applications. While Defendants concede that the statute could apply to international human rights advocacy and peacekeeping, thus implicating First Amendment values, they argue that because the statute is not aimed at interfering with expressive conduct, Plaintiffs' overbreadth claim must be dismissed. Defendants argue that any poten-

tial First Amendment violation can be remedied by "as applied" litigation.

In their reply, Plaintiffs reiterate that the ban is directed at pure speech, not just at the margins, and at all expert advice and assistance, regardless of whether it is intended to or could ever further terrorist activity. They also argue that the examples identified by Defendants as activities which may be legitimately barred are the same as those used in defense of the ban on "training," despite the fact that the ban is not limited to those forms of advice and assistance. Finally, Plaintiffs contend that *Virginia v. Hicks* does not contradict their position, as the law in *Virginia v. Hicks* had nothing to do with the plaintiffs' speech and the Court indicated that the plaintiff had failed to show that the bar would be applied to anyone engaging in constitutionally protected speech.

The Court agrees with Defendants that Plaintiffs have failed to meet their burden in establishing that the prohibition on the provision of "expert advice or assistance" is substantially overbroad, thereby warranting an injunction of its enforcement. Although Plaintiffs have provided examples of some protected speech which may be prohibited by the application of the ban, this is not sufficient to meet the burden imposed by *Virginia v. Hicks*. The USA PATRIOT Act's prohibition of the provision of "expert advice or assistance" is aimed at furthering a legitimate state interest: curbing support for designated foreign terrorist organizations' activities, which unquestionably constitute "harmful, constitutionally unprotected conduct." *Virginia v. Hicks*, 123 S.Ct. at 2197. Plaintiffs have failed to demonstrate that

---

8. Defendants also argue that the record is devoid of any facts showing that Plaintiffs' alleged intended conduct comes within the statute's reach, asserting that with the exception of the doctors' medical expertise, Plain-

tiffs have presented insufficient evidence that the advice and assistance they seek to offer is "expert" for purposes of the USA PATRIOT Act. The Court already rejected this argument in its ruling on Defendants' motion to dismiss.

the USA PATRIOT Act's application to protected speech is "substantial" both in an absolute sense and relative to the scope of the law's plainly legitimate applications. The Court therefore declines to apply the "strong medicine" of the overbreadth doctrine, finding instead that as-applied litigation will provide a sufficient safeguard for any potential First Amendment violation.

### 2. Plaintiffs Have Failed to Demonstrate that the Prohibition on the Provision of "Expert Advice or Assistance" Criminalizes Associational Speech.

Plaintiffs argue that the prohibition on providing "expert advice or assistance" punishes pure speech by penalizing moral innocents for the culpable acts of the groups that they have supported through their speech, without requiring a showing of intent to incite or further terrorist or other illegal activity. For support, they cite *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) and *McCoy v. Stewart*, 282 F.3d 626 (9th Cir.), *cert. denied*, 537 U.S. 993, 123 S.Ct. 468, 154 L.Ed.2d 361 (2002). Plaintiffs attempt to distinguish this argument from that made in *HLP I* on the ground that they do not seek to provide material support in the form of money or any other tangible asset, but only through associational speech and assistance.

In their opposition, Defendants contend that this argument was previously raised and rejected by the Court in *HLP I*, where the Court found that the material support restriction (1) was content-neutral and not aimed at the suppression of free speech and (2) does not criminalize mere association with designated foreign terrorist organizations. These rulings were affirmed by the Ninth Circuit. *See* 205 F.3d at 1135. According to Defendants, the addition of "expert advice or assistance" should not alter the analysis of the issue by this Court or the Ninth Circuit, and Plaintiffs'

efforts to relitigate *HLP I* should be rejected.

The Court agrees with Defendants that Plaintiffs' attempt to relitigate this issue is improper. In addition, as discussed in Note 10, the Ninth Circuit recently clarified that the knowledge required by the statute is of a group's designation as a terrorist organization, or its participation in unlawful activities that caused it to be so designated. There is thus no risk of the prosecution of "moral innocents" under the law, contrary to Plaintiffs' assertion. The Court therefore DENIES Plaintiffs' motion for summary judgment on this basis.

### 3. Plaintiffs Have Failed to Demonstrate that the Prohibition Gives the Secretary of State Unreviewable Authority to Designate Groups as Terrorist Organizations.

Plaintiffs' final argument in support of their motion for summary judgment is that the prohibition on providing "expert advice or assistance" found in the USA PATRIOT Act violates the First and Fifth Amendments by granting the Secretary of State unreviewable authority to designate groups as terrorist organizations. Plaintiffs recognize that the Court previously rejected the same argument made with respect to the material support provision as a whole in *HLP I*. 9 F.Supp.2d at 1198–1201 (finding that Plaintiffs had failed to establish a probability of success on the merits of their claim that the Secretary of State had unfettered discretion to target disfavored political groups), *aff'd*, 205 F.3d at 1136–1137 (finding that the AEDPA's standard is not so vague or indeterminate as to give the Secretary of State unfettered discretion). Plaintiffs have not presented any arguments in their motion that would require the Court to reconsider its previous determination. The Court therefore DENIES Plaintiffs' motion for sum-

**1204**

mary judgment on this basis, concluding that Plaintiffs have failed to establish that the prohibition on providing "expert advice and assistance" violates the First and Fifth Amendments by giving the Secretary of State virtually unreviewable authority to designate groups as terrorist organizations.

## V. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is DENIED.

Plaintiffs' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART as follows:

1.  Plaintiffs' motion is GRANTED to the extent the Court finds that the term "expert advice or assistance" is impermissibly vague; and

2.  Plaintiffs' motion is DENIED with respect to the remaining arguments raised.

Accordingly, Defendants, their officers, agents, employees, and successors are ENJOINED from enforcing the USA PATRIOT Act's prohibition on providing "expert advice or assistance" to either the Kurdistan Workers' Party, a.k.a. Partiya Karkeran Kurdistan, a.k.a. PKK, a.k.a. the Kurdistan Freedom and Democracy Congress, a.k.a. KADEK, a.k.a. Freedom and Democracy Congress of Kurdistan, a.k.a. the People's Defense Force, a.k.a. Halu Mesru Savunma Kuvveti (HSK); or the Liberation Tigers of Tamil Eelam, a.k.a. LTTE, a.k.a. Tamil Tigers, a.k.a. Ellalan Force against any of the named Plaintiffs or their members. The Court declines to grant a nationwide injunction.

**SO ORDERED.**