Chief Justice Roberts
delivered the opinion of the Court.
Congress has prohibited the provision of “material support or resources” to certain foreign organizations that engage in terrorist activity. 18 U. S. C. § 2339B(a)(l). That prohibition is based on a finding that the specified organizations “are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.” Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), § 301(a)(7), 110 Stat. 1247, note following 18 U. S. C. §2339B (Findings and Purpose). The plaintiffs in this litigation *8 seek to provide support to two such organizations. Plaintiffs claim that they seek to facilitate only the lawful, nonviolent purposes of those groups, and that applying the material-support law to prevent them from doing so violates the Constitution. In particular, they claim that the statute is too vague, in violation of the Fifth Amendment, and that it infringes their rights to freedom of speech and association, in violation of the First Amendment. We conclude that the material-support statute is constitutional as applied to the particular activities plaintiffs have told us they wish to pursue. We do not, however, address the resolution of more difficult cases that may arise under the statute in the future.
I
This litigation concerns 18 U. S. C. § 2339B, which makes it a federal crime to “knowingly provid[e] material support or resources to a foreign terrorist organization.”[1] Congress has amended the definition of “material support or resources” periodically, but at present it is defined as follows:
“[T]he term “material support or resources’ means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, *9 weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.” § 2339A(b)(l); see also § 2339B(g)(4).
The authority to designate an entity a “foreign terrorist organization” rests with the Secretary of State. 8 U. S. C. §§ 1189(a)(1), (d)(4). She may, in consultation with the Secretary of the Treasury and the Attorney General, so designate an organization upon finding that it is foreign, engages in “terrorist activity” or “terrorism,” and thereby “threatens the security of United States nationals or the national security of the United States.” §§ 1189(a)(1), (d)(4). “‘[N]ational security’ means the national defense, foreign relations, or economic interests of the United States.” § 1189(d)(2). An entity designated a foreign terrorist organization may seek review of that designation before the D. C. Circuit within 30 days of that designation. § 1189(e)(1).
In 1997, the Secretary of State designated 30 groups as foreign terrorist organizations. See 62 Fed. Reg. 52650. Two of those groups are the Kurdistan Workers’ Party (also known as the Partiya Karkeran Kurdistan, or PKK) and the Liberation Tigers of Tamil Eelam (LTTE). The PKK is an organization founded in 1974 with, the aim of establishing an independent Kurdish state in southeastern Turkey. Humanitarian Law Project v. Reno, 9 F. Supp. 2d 1176, 1180-1181 (CD Cal. 1998); Brief for Petitioners in No. 08-1498, p. 6 (hereinafter Brief for Government). The LTTE is an organization founded in 1976 for the purpose of creating an independent Tamil state in Sri Lanka. 9 F. Supp. 2d, at 1182; Brief for Government 6. The District Court in this action found that the PKK and LTTE engage in political and humanitarian activities. See 9 F. Supp. 2d, at 1180-1182. The Government has presented evidence that both groups have also committed numerous terrorist attacks, some of which have harmed American citizens. See App. 128-133. The LTTE sought judicial review of its designation as a for *10 eign terrorist organization; the D. C. Circuit upheld that designation. See People’s Mojahedin Organization of Iran v. Department of State, 182 F. 3d 17, 18-19, 25 (1999). The PKK did not challenge its designation. 9 F. Supp. 2d, at 1180.
Plaintiffs in this litigation are two U. S. citizens and six domestic organizations: the Humanitarian Law Project (HLP) (a human rights organization with consultative status to the United Nations); Ralph Fertig (the HLP’s president, and a retired Administrative Law Judge); Nagalingam Jeyalingam (a Tamil physician, born in Sri Lanka and a naturalized U. S. citizen); and five nonprofit groups dedicated to the interests of persons of Tamil descent. Brief for Petitioners in No. 09-89, pp. ii, 10 (hereinafter Brief for Plaintiffs); App. 48. In 1998, plaintiffs filed suit in federal court challenging the constitutionality of the material-support statute, § 2339B. Plaintiffs claimed that they wished to provide support for the humanitarian and political activities of the PKK and LTTE in the form of monetary contributions, other tangible aid, legal training, and political advocacy, but that they could not do so for fear of prosecution under §2339B. 9 F. Supp. 2d, at 1180-1184.[2]
As relevant here, plaintiffs claimed that the material-support statute was unconstitutional on two grounds: First, it violated their freedom of speech and freedom of association under the First Amendment, because it criminalized their *11 provision of material support to the PKK and LTTE, without requiring the Government to prove that plaintiffs had a specific intent to further the unlawful ends of those organizations. Id., at 1184. Second, plaintiffs argued that the statute was unconstitutionally vague. Id., at 1184-1185.
Plaintiffs moved for a preliminary injunction, which the District Court granted in part. The District Court held that plaintiffs had not established a probability of success on their First Amendment speech and association claims. See id., at 1196-1197. But the court held that plaintiffs had established a probability of success on their claim that, as applied to them, the statutory terms “personnel” and “training” in the definition of “material support” were impermissibly vague. See id., at 1204.
The Court of Appeals affirmed. 205 F. 3d 1130, 1138 (CA9 2000). The court rejected plaintiffs’ speech and association claims, including their claim that § 2339B violated the First Amendment in barring them from contributing money to the PKK and LTTE. See id., at 1133-1136. But the Court of Appeals agreed with the District Court that the terms “personnel” and “training” were vague because it was “easy to imagine protected expression that falls within the bounds” of those terms. Id., at 1138; see id., at 1137.
With the preliminary injunction issue decided, the action returned to the District Court, and the parties moved for summary judgment on the merits. The District Court entered a permanent injunction against applying to plaintiffs the bans on “personnel” and “training” support. See No. CV-98-1971 ABC (BQRx), 2001 WL 36105333 (CD Cal., Oct. 2, 2001). The Court of Appeals affirmed. 352 F. 3d 382 (CA9 2003).
Meanwhile, in 2001, Congress amended the definition of “material support or resources” to add the term “expert advice or assistance.” Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT ACT), *12 § 805(a)(2)(B), 115 Stat. 377. In 2003, plaintiffs filed a second action challenging the constitutionality of that term as applied to them. 309 F. Supp. 2d 1185, 1192 (CD Cal. 2004).
In that action, the Government argued that plaintiffs lacked standing and that their preenforcement claims were not ripe. Id., at 1194. The District Court held that plaintiffs’ claims were justiciable because plaintiffs had sufficiently demonstrated a “genuine threat of imminent prosecution,” id., at 1195 (internal quotation marks omitted), and because § 2339B had the potential to chill plaintiffs’ protected expression, see id., at 1197-1198. On the merits, the District Court held that the term “expert advice or assistance” was impermissibly vague. Id., at 1201. The District Court rejected, however, plaintiffs’ First Amendment claims that the new term was substantially overbroad and criminalized associational speech. See id., at 1202, 1203.
The parties cross-appealed. While the cross-appeals were pending, the Ninth Circuit granted en banc rehearing of the panel’s 2003 decision in plaintiffs’ first action (involving the terms “personnel” and “training”). See 382 F. 3d 1154, 1155 (2004). The en banc court heard reargument on December 14, 2004. See 380 F. Supp. 2d 1134, 1138 (CD Cal. 2005). Three days later, Congress again amended §2339B and the definition of “material support or resources.” Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), §6603, 118 Stat. 3762-3764.
In IRTPA, Congress clarified the mental state necessary to violate § 2339B, requiring knowledge of the foreign group’s designation as a terrorist organization or the group’s commission of terrorist acts. §2339B(a)(l). Congress also added the term “service” to the definition of “material support or resources,” § 2339A(b)(l), and defined “training” to mean “instruction or teaching designed to impart a specific skill, as opposed to general knowledge,” § 2339A(b)(2). It also defined “expert advice or assistance” to mean “advice or assistance derived from scientific, technical or other special *13 ized knowledge.” § 2339A(b)(3). Finally, IRTPA clarified the scope of the term “personnel” by providing:
“No person may be prosecuted under [§2339B] in connection with the term ‘personnel’ unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization’s direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization’s direction and control.” §2339B(h).
Shortly after Congress enacted IRTPA, the en banc Court of Appeals issued an order in plaintiffs’ first action. 393 F. 3d 902, 903 (CA9 2004). The en banc court affirmed the rejection of plaintiffs’ First Amendment claims for the reasons set out in the Ninth Circuit’s panel decision in 2000. See ibid. In light of IRTPA, however, the en banc court vacated the panel’s 2003 judgment with respect to vagueness, and remanded to the District Court for further proceedings. Ibid. The Ninth Circuit panel assigned to the cross-appeals in plaintiffs’ second action (relating to “expert advice or assistance”) also remanded in light of IRTPA. See 380 F. Supp. 2d, at 1139.
The District Court consolidated the two actions on remand. See ibid. The court also allowed plaintiffs to challenge the new term “service.” See id., at 1151, n. 24. The parties moved for summary judgment, and the District Court granted partial relief to plaintiffs on vagueness grounds. See id., at 1156.
The Court of Appeals affirmed once more. 552 F. 3d 916, 933 (CA9 2009). The court first rejected plaintiffs’ claim that the material-support statute would violate due process *14 unless it were read to require a specific intent to further the illegal ends of a foreign terrorist organization. See id., at 926-927. The Ninth Circuit also held that the statute was not overbroad in violation of the First Amendment. See id., at 931-932. As for vagueness, the Court of Appeals noted that plaintiffs had not raised a “facial vagueness challenge.” Id., at 929, n. 6. The court held that, as applied to plaintiffs, the terms “training,” “expert advice or assistance” (when derived from “other specialized knowledge”), and “service” were vague because they “continue [d] to cover constitutionally protected advocacy,” but the term “personnel” was not vague because it “no longer criminalize[d] pure speech protected by the First Amendment.” Id., at 929-931.
The Government petitioned for certiorari, and plaintiffs filed a conditional cross-petition. We granted both petitions. 557 U. S. 966 (2009).
II
Given the complicated 12-year history of this litigation, we pause to clarify the questions before us. Plaintiffs challenge § 2339B’s prohibition on four types of material support— “training,” “expert advice or assistance,” “service,” and “personnel.” They raise three constitutional claims. First, plaintiffs claim that § 2339B violates the Due Process Clause of the Fifth Amendment because these four statutory terms are impermissibly vague. Second, plaintiffs claim that §2339B violates their freedom of speech under the First Amendment. Third, plaintiffs claim that §2339B violates their First Amendment freedom of association.
Plaintiffs do not challenge the above statutory terms in all their applications. Rather, plaintiffs claim that §2339B is invalid to the extent it prohibits them from engaging in certain specified activities. See Brief for Plaintiffs 16-17, n. 10. With respect to the HLP and Judge Fertig, those activities are: (1) “train[ing] members of [the] PKK on how to use humanitarian and international law to peacefully resolve disputes”; (2) “engaging] in political advocacy on behalf of *15 Kurds who live in Turkey”; and (3) “teach[ing] PKK members how to petition various representative bodies such as the United Nations for relief.” 552 F. 3d, at 921, n. 1; see 380 F. Supp. 2d, at 1136. With respect to the other plaintiffs, those activities are: (1) “train[ing] members of [the] LTTE to present claims for tsunami-related aid to mediators and international bodies”; (2) “offering] their legal expertise in negotiating peace agreements between the LTTE and the Sri Lankan government”; and (3) “engag[ing] in political advocacy on behalf of Tamils who live in Sri Lanka.” 552 F. 3d, at 921, n. 1; see 380 F. Supp. 2d, at 1137.
Plaintiffs also state that “the LTTE was recently defeated militarily in Sri Lanka,” so “[m]uch of the support the Tamil organizations and Dr. Jeyalingam sought to provide is now moot.” Brief for Plaintiffs 11, n. 5. Plaintiffs thus seek only to support the LTTE “as a political organization outside Sri Lanka advocating for the rights of Tamils.” Ibid. Counsel for plaintiffs specifically stated at oral argument that plaintiffs no longer seek to teach the LTTE how to present claims for tsunami-related aid, because the LTTE now “has no role in Sri Lanka.” Tr. of Oral Arg. 63. For that reason, helping the LTTE negotiate a peace agreement with Sri Lanka appears to be moot as well. Thus, we do not consider the application of § 2339B to those activities here.
One last point. Plaintiffs seek preenforcement review of a criminal statute. Before addressing the merits, we must be sure that this is a justiciable case or controversy under Article III. We conclude that it is: Plaintiffs face “a credible threat of prosecution” and “should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.” Babbitt v. Farm Workers, 442 U. S. 289, 298 (1979) (internal quotation marks omitted). See also MedImmune, Inc. v. Genentech, Inc., 549 U. S. 118, 128-129 (2007).
Plaintiffs claim that they provided support to the PKK and LTTE before the enactment of § 2339B and that they would provide similar support again if the statute’s allegedly un *16 constitutional bar were lifted. See 309 F. Supp. 2d, at 1197. The Government tells us that it has charged about 150 persons with violating § 2339B, and that several of those prosecutions involved the enforcement of the statutory terms at issue here. See Brief for Government 5. The Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do. Cf. Tr. of Oral Arg. 57-58. See Babbitt, supra, at 302. See also Milavetz, Gallop & Milavetz, P. A. v. United States, 559 U. S. 229, 234, 248-249 (2010) (considering an as-applied preenforcement challenge brought under the First Amendment). Based on these considerations, we conclude that plaintiffs’ claims are suitable for judicial review (as one might hope after 12 years of litigation).
Ill
Plaintiffs claim, as a threshold matter, that we should affirm the Court of Appeals without reaching any issues of constitutional law. They contend that we should interpret the material-support statute, when applied to speech, to require proof that a defendant intended to further a foreign terrorist organization’s illegal activities. That interpretation, they say, would end the litigation because plaintiffs’ proposed activities consist of speech, but plaintiffs do not intend to further unlawful conduct by the PKK or LTTE.
We reject plaintiffs’ interpretation of §2339B because it is inconsistent with the text of the statute. Section 2339B(a)(l) prohibits “knowingly” providing material support. It then specifically describes the type of knowledge that is required: “To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged or engages in terrorist activity ... , or that the organization has engaged or engages in terrorism ....” Ibid. Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization’s *17 connection to terrorism, not specific intent to further the organization’s terrorist activities.
Plaintiffs’ interpretation is also untenable in light of the sections immediately surrounding § 2339B, both of which do refer to intent to further terrorist activity. See § 2339A(a) (establishing criminal penalties for one who “provides material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of” statutes prohibiting violent terrorist acts); § 23390(a)(1) (setting criminal penalties for one who “unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out” other unlawful acts). Congress enacted §2339A in 1994 and §2339C in 2002. See § 120005(a), 108 Stat. 2022 (§ 2339A); § 202(a), 116 Stat. 724 (§ 2339C). Yet Congress did not import the intent language of those provisions into §2339B, either when it enacted §2339B in 1996, or when it clarified § 2339B’s knowledge requirement in 2004.
Finally, plaintiffs give the- game away when they argue that a specific intent requirement should apply only when the material-support statute applies to speech. There is no basis whatever in the text of § 2339B to read the same provisions in that statute as requiring intent in some circumstances but not others. It is therefore clear that plaintiffs are asking us not to interpret § 2339B, but to revise it. “Although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute.” Scales v. United States, 367 U. S. 203, 211 (1961).
Scales is the case on which plaintiffs most heavily rely, but it is readily distinguishable. That case involved the Smith Act, which prohibited membership in a group advocating the violent overthrow of the government. The Court held that a person could not be convicted under the statute unless he had knowledge of the group’s illegal advocacy and a specific *18 intent to bring about violent overthrow. Id., at 220-222, 229. This action is different: Section 2339B does not criminalize mere membership in a designated foreign terrorist organization. It instead prohibits providing “material support” to such a group. See infra, at 26, 39. Nothing about Scales suggests the need for a specific intent requirement in such a case. The Court in Scales, moreover, relied on both statutory text and precedent that had interpreted closely related provisions of the Smith Act to require specific intent. 367 U. S., at 209, 221-222. Plaintiffs point to nothing similar here.
We cannot avoid the constitutional issues in this litigation through plaintiffs’ proposed interpretation of § 2339B.[3]
IV
We turn to the question whether the material-support statute, as applied to plaintiffs, is impermissibly vague under the Due Process Clause of the Fifth Amendment. “A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standard-less that it authorizes or encourages seriously discriminatory enforcement.” United States v. Williams, 553 U. S. 285, 304 (2008). We consider whether a statute is vague as applied to the particular facts at issue, for “[a] plaintiff who engages *19 in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.” Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U. S. 489, 495 (1982). We have said that when a statute “interferes with the right of free speech or of association, a more stringent vagueness test should apply.” Id., at 499. “But 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.’” Williams, supra, at 304 (quoting Ward v. Rock Against Racism, 491 U. S. 781, 794 (1989)).
The Court of Appeals did not adhere to these principles. Instead, the lower court merged plaintiffs’ vagueness challenge with their First Amendment claims, holding that portions of the material-support statute were unconstitutionally vague because they applied to protected speech — regardless of whether those applications were clear. The court stated that, even if persons of ordinary intelligence understood the scope of the term “training,” that term would “remai[n] impermissibly vague” because it could “be read to encompass speech and advocacy protected by the First Amendment.” 552 F. 3d, at 929. It also found “service” and a portion of “expert advice or assistance” to be vague because those terms covered protected speech. Id., at 929-930.
Further, in spite of its own statement that it was not addressing a “facial vagueness challenge,” id., at 929, n. 6, the Court of Appeals considered the statute’s application to facts not before it. Specifically, the Ninth Circuit relied on the Government’s statement that §2339B would bar filing an amicus brief in support of a foreign terrorist organization— which plaintiffs have not told us they wish to do, and which the Ninth Circuit did not say plaintiffs wished to do — to conclude that the statute barred protected advocacy and was therefore vague. See id., at 930. By deciding how the statute applied in hypothetical circumstances, the Court of Appeals’ discussion of vagueness seemed to incorporate elements of First Amendment overbreadth doctrine. See id., *20 at 929-930 (finding it “easy to imagine” protected expression that would be barred by §2339B (internal quotation marks omitted)); id., at 930 (referring to both vagueness and overbreadth).
In both of these respects, the Court of Appeals contravened the rule that “[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.” Hoffman Estates, supra, at 495. That rule makes no exception for conduct in the form of speech. See Parker v. Levy, 417 U. S. 733, 755-757 (1974). Thus, even to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others. Such a plaintiff may have a valid overbreadth claim under the First Amendment, but our precedents make clear that a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression. See Williams, supra, at 304; Hoffman Estates, supra, at 494-495, 497. Otherwise the doctrines would be substantially redundant.
Under a proper analysis, plaintiffs’ claims of vagueness lack merit. Plaintiffs do not argue that the material-support statute grants too much enforcement discretion to the Government. We therefore address only whether the statute “provide[s] a person of ordinary intelligence fair notice of what is prohibited.” Williams, 553 U. S., at 304.
As a general matter, the statutory terms at issue here are quite different from the sorts of terms that we have previously declared to be vague. We have in the past “struck down statutes that tied criminal culpability to whether the defendant’s conduct was ‘annoying’ or ‘indecent’ — wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.” Id., at 306; see also Papachristou v. Jacksonville, 405 U. S. 156, n. 1 (1972) (hold *21 ing vague an ordinance that punished “vagrants,” defined to include “[r]ogues and vagabonds,” “persons who use juggling,” and “common night walkers” (internal quotation marks omitted)). Applying the statutory terms in this action — “training,” “expert advice or assistance,” “service,” and “personnel” — does not require similarly untethered, subjective judgments.
Congress also took care to add narrowing definitions to the material-support statute over time. These definitions increased the clarity of the statute’s terms. See § 2339A(b)(2) (“ ‘training’ means instruction or teaching designed to impart a specific skill, as opposed to general knowledge”); §2339A(b)(3) (“‘expert advice or assistance’ means advice or assistance derived from scientific, technical or other specialized knowledge”); §2339B(h) (clarifying the scope of “personnel”). And the knowledge requirement of the statute further reduces any potential for vagueness, as we have held with respect to other statutes containing a similar requirement. See Hill v. Colorado, 530 U. S. 703, 732 (2000); Posters ‘N’ Things, Ltd. v. United States, 511 U. S. 513, 523, 526 (1994); see also Hoffman Estates, supra, at 499.
Of course, the scope of the material-support statute may not be clear in every application. But the dispositive point here is that the statutory terms are clear in their application to plaintiffs’ proposed conduct, which means that plaintiffs’ vagueness challenge must fail. Even assuming that a heightened standard applies because the material-support statute potentially implicates speech, the statutory terms are not vague as applied to plaintiffs. See Grayned v. City of Rockford, 408 U. S. 104,114-115 (1972) (rejecting a vagueness challenge to a criminal law that implicated First Amendment activities); Scales, 367 U. S., at 223 (same).
Most of the activities in which plaintiffs seek to engage readily fall within the scope of the terms “training” and “expert advice or assistance.” Plaintiffs want to “train members of [the] PKK on how to use humanitarian and interna *22 tional law to peacefully resolve disputes,” and “teach PKK members how to petition various representative bodies such as the United Nations for relief.” 552 F. 3d, at 921, n. 1. A person of ordinary intelligence would understand that instruction on resolving disputes through international law falls within the statute’s definition of “training” because it imparts a “specific skill,” not “general knowledge.” §2339A(b)(2). Plaintiffs’ activities also fall comfortably within the scope of “expert advice or assistance”: A reasonable person would recognize that teaching the PKK how to petition for humanitarian relief before the United Nations involves advice derived from, as the statute puts it, “specialized knowledge.” § 2339A(b)(3). In fact, plaintiffs themselves have repeatedly used the terms “training” and “expert advice” throughout this litigation to describe their own proposed activities, demonstrating that these common terms readily and naturally cover plaintiffs’ conduct. See, e. g., Brief for Plaintiffs 10, 11; App. 56, 58, 59, 61, 62, 63, 80, 81, 98, 99, 106, 107, 117.
Plaintiffs respond by pointing to hypothetical situations designed to test the limits of “training” and “expert advice or assistance.” They argue that the statutory definitions of these terms use words of degree — like “specific,” “general,” and “specialized” — and that it is difficult to apply those definitions in particular cases. See Brief for Plaintiffs 27 (debating whether teaching a course on geography would constitute training); id., at 29. And they cite Gentile v. State Bar of Nev., 501 U. S. 1030 (1991), in which we found vague a state bar rule providing that a lawyer in a criminal case, when speaking to the press, “may state without elaboration . . . the general nature of the . . . defense.” Id., at 1048 (internal quotation marks omitted).
Whatever force these arguments might have in the abstract, they are beside the point here. Plaintiffs do not propose to teach a course on geography, and cannot seek refuge in imaginary cases that straddle the boundary between “spe *23 cific skills” and “general knowledge.” See Parker v. Levy, 417 U. S., at 756. We emphasized this point in Scales, holding that even if there might be theoretical doubts regarding the distinction between “active” and “nominal” membership in an organization — also terms of degree — the defendant’s vagueness challenge failed because his “case presented] no such problem.” 367 U. S., at 223.
Gentile was different. There the asserted vagueness in a state bar rule was directly implicated by the facts before the Court: Counsel had reason to suppose that his particular statements to the press would not violate the rule, yet he was disciplined nonetheless. See 501 U. S., at 1049-1051. We did not suggest that counsel could escape discipline on vagueness grounds if his own speech were plainly prohibited.
Plaintiffs also contend that they want to engage in “political advocacy” on behalf of Kurds living in Turkey and Tamils living in Sri Lanka. 552 F. 3d, at 921, n. 1. They are concerned that such advocacy might be regarded as “material support” in the form of providing “personnel” or “service[s],” and assert that the statute is unconstitutionally vague because they cannot tell.
As for “personnel,” Congress enacted a limiting definition in IRTPA that answers plaintiffs’ vagueness concerns. Providing material support that constitutes “personnel” is defined as knowingly providing a person “to work under that terrorist organization’s direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization.” §2339B(h). The statute makes clear that “personnel” does not cover independent advocacy: “Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization’s direction and control.” Ibid.
“[Sjervice” similarly refers to concerted activity, not independent advocacy. See Webster’s Third New International Dictionary 2075 (1993) (defining “service” to mean “the *24 performance of work commanded or paid for by another: a servant’s duty: attendance on a superior”; or “an act done for the benefit or at the command of another”). Context confirms that ordinary meaning here. The statute prohibits providing a service “to a foreign terrorist organization.” §2339B(a)(l) (emphasis added). The use of the word “to” indicates a connection between the service and the foreign group. We think a person of ordinary intelligence would understand that independently advocating for a cause is different from providing a service to a group that is advocating for that cause.
Moreover, if independent activity in support of a terrorist group could be characterized as a “service,” the statute’s specific exclusion of independent activity in the definition of “personnel” would not make sense. Congress would not have prohibited under “service” what it specifically exempted from prohibition under “personnel.” The other types of material support listed in the statute, including “lodging,” “weapons,” “explosives,” and “transportation,” § 2339A(b)(l), are not forms of support that could be provided independently of a foreign terrorist organization. We interpret “service” along the same lines. Thus, any independent advocacy in which plaintiffs wish to engage is not prohibited by § 2339B. On the other hand, a person of ordinary intelligence would understand the term “service” to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization.
Plaintiffs argue that this construction of the statute poses difficult questions of exactly how much direction or coordination is necessary for an activity to constitute a “service.” See Reply Brief for Petitioners in No. 09-89, p. 14 (hereinafter Reply Brief for Plaintiffs) (“Would any communication with any member be sufficient? With a leader? Must the ‘relationship’ have any formal elements, such as an employment or contractual relationship? What about a relationship through an intermediary?”). The problem with these *25 questions is that they are entirely hypothetical. Plaintiffs have not provided any specific articulation of the degree to which they seek to coordinate their advocacy with the PKK and LTTE. They have instead described the form of their intended advocacy only in the most general terms. See, e. g., Brief for Plaintiffs 10-11 (plaintiffs “would like, among other things, to offer their services to advocate on behalf of the rights of the Kurdish people and the PKK before the United Nations and the United States Congress” (internal quotation marks and alteration omitted)); App. 59 (plaintiffs would like to “write and distribute publications supportive of the PKK and the cause of Kurdish liberation” and “advocate for the freedom of political prisoners in Turkey”).
Deciding whether activities described at such a level of generality would constitute prohibited “service^]” under the statute would require “sheer speculation” — which means that plaintiffs cannot prevail in their preenforcement challenge. See Washington State Grange v. Washington State Republican Party, 552 U. S. 442, 454 (2008). It is apparent with respect to these claims that “gradations of fact or charge would make a difference as to criminal liability,” and so “adjudication of the reach and constitutionality of [the statute] must await a concrete fact situation.” Zemel v. Rusk, 381 U. S. 1, 20 (1965).
V
A
We next consider whether the material-support statute, as applied to plaintiffs, violates the freedom of speech guaranteed by the First Amendment. Both plaintiffs and the Government take extreme positions on this question. Plaintiffs claim that Congress has banned their “pure political speech.” E. g., Brief for Plaintiffs 2, 25, 43. It has not. Under the material-support statute, plaintiffs may say anything they wish on any topic. They may speak and write *26 freely about the PKK and LTTE, the Governments of Turkey and Sri Lanka, human rights, and international law. They may advocate before the United Nations. As the Government states: “The statute does not prohibit independent advocacy or expression of any kind.” Brief for Government 13. Section 2339B also “does not prevent [plaintiffs] from becoming members of the PKK and LTTE or impose any sanction on them for doing so.” Id., at 60. Congress has not, therefore, sought to suppress ideas or opinions in the form of “pure political speech.” Rather, Congress has prohibited “material support,” which most often does not take the form of speech at all. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations.[4]
For its part, the Government takes the foregoing too far, claiming that the only thing truly at issue in this litigation is conduct, not speech. Section 2339B is directed at the fact of plaintiffs’ interaction with the PKK and LTTE, the Government contends, and only incidentally burdens their expression. The Government argues that the proper standard of review is therefore the one set out in United States v. O’Brien, 391 U. S. 367 (1968). In that case, the Court rejected a First Amendment challenge to a conviction under a generally applicable prohibition on destroying draft cards, even though O’Brien had burned his card in protest against the draft. See id., at 370, 376, 382. In so doing, we applied what we have since called “intermediate scrutiny,” under which a “content-neutral regulation will be sustained under the First Amendment if it advances important governmental *27 interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.” Turner Broadcasting System, Inc. v. FCC, 520 U. S. 180, 189 (1997) (citing O'Brien, supra, at 377).
The Government is wrong that the only thing actually at issue in this litigation is conduct, and therefore wrong to argue that O’Brien provides the correct standard of review.[5] O’Brien does not provide the applicable standard for reviewing a content-based regulation of speech, see R. A. V. v. St. Paul, 505 U. S. 377, 385-386 (1992); Texas v. Johnson, 491 U. S. 397, 403, 406-407 (1989), and § 2339B regulates speech on the basis of its content. Plaintiffs want to speak to the PKK and LTTE, and whether they may do so under § 2339B depends on what they say. If plaintiffs’ speech to those groups imparts a “specific skill” or communicates advice derived from “specialized knowledge” — for example, training on the use of international law or advice on petitioning the United Nations — then it is barred. See Brief for Government 33-34. On the other hand, plaintiffs’ speech is not barred if it imparts only general or unspecialized knowledge. See id., at 32.
The Government argues that §2339B should nonetheless receive intermediate scrutiny because it generally functions as a regulation of conduct. That argument runs headlong into a number of our precedents, most prominently Cohen *28 v. California, 403 U. S. 15 (1971). Cohen also involved a generally applicable regulation of conduct, barring breaches of the peace. See id., at 16. But when Cohen was convicted for wearing a jacket bearing an epithet, we did not apply O’Brien. See 403 U. S., at 16, 18. Instead, we recognized that the generally applicable law was directed at Cohen because of what his speech communicated — he violated the breach of the peace statute because of the offensive content of his particular message. We accordingly applied more rigorous scrutiny and reversed his conviction. See id., at 18-19, 26.
This suit falls into the same category. The law here may be described as directed at conduct, as the law in Cohen was directed at breaches of the peace, but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message. As we explained in Texas v. Johnson: “If the [Government’s] regulation is not related to expression, then the less stringent standard we announced in United States v. O’Brien for regulations of noncommunicative conduct controls. If it is, then we are outside of O’Brien’s test, and we must [apply] a more demanding standard.” 491 U. S., at 403 (citation omitted).
B
The First Amendment issue before us is more refined than either plaintiffs or the Government would have it. It is not whether the Government may prohibit pure political speech, or may prohibit material support in the form of conduct. It is instead whether the Government may prohibit what plaintiffs want to do — provide material support to the PKK and LTTE in the form of speech.
Everyone agrees that the Government’s interest in combating terrorism is an urgent objective of the highest order. See Brief for Plaintiffs 51. Plaintiffs’ complaint is that the ban on material support, applied to what they wish to do, is not “necessary to further that interest.” Ibid. The objec *29 tive of combating terrorism does not justify prohibiting their speech, plaintiffs argue, because their support will advance only the legitimate activities of the designated terrorist organizations, not their terrorism. Id., at 51-52.
Whether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism is an empirical question. When it enacted § 2339B in 1996, Congress made specific findings regarding the serious threat posed by international terrorism. See AEDPA §§ 301(a)(1)-(7), 110 Stat. 1247, note following 18 U. S. C. §2339B (Findings and Purpose). One of those findings explicitly rejects plaintiffs’ contention that their support would not further the terrorist activities of the PKK and LTTE: “[Fjoreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.” § 301(a)(7) (emphasis added).
Plaintiffs argue that the reference to “any contribution” in this finding meant only monetary support. There is no reason to read the finding to be so limited, particularly because Congress expressly prohibited so much more than monetary support in §2339B. Congress’s use of the term “contribution” is best read to reflect a determination that any form of material support furnished “to” a foreign terrorist organization should be barred, which is precisely what the material-support statute does. Indeed, when Congress enacted §2339B, Congress simultaneously removed an exception that had existed in § 2339A(a) (1994 ed.) for the provision of material support in the form of “humanitarian assistance to persons not directly involved in” terrorist activity. AEDPA §323, 110 Stat. 1255; 205 F. 3d, at 1136. That repeal demonstrates that Congress considered and rejected the view that ostensibly peaceful aid would have no harmful effects.
We are convinced that Congress was justified in rejecting that view. The PKK and LTTE are deadly groups. “The *30 PKK’s insurgency has claimed more than 22,000 lives.” Declaration of Kenneth R. McKune, App. 128, ¶ 5 (hereinafter McKune Affidavit). The LTTE has engaged in extensive suicide bombings and political assassinations, including killings of the Sri Lankan President, Security Minister, and Deputy Defense Minister. Id., at 130-132; Brief for Government 6-7. “On January 31, 1996, the LTTE exploded a truck bomb filled with an estimated 1,000 pounds of explosives at the Central Bank in Colombo, killing 100 people and injuring more than 1,400. This bombing was the most deadly terrorist incident in the world in 1996.” McKune Affidavit, App. 131, ¶ 6.h. It is not difficult to conclude as Congress did that the “tain[t]” of such violent activities is so great that working in coordination with or at the command of the PKK and LTTE serves to legitimize and further their terrorist means. AEDPA § 301(a)(7), 110 Stat. 1247.
Material support meant to “promot[e] peaceable, lawful conduct,” Brief for Plaintiffs 51, can further terrorism by foreign groups in multiple ways. “Material support” is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups — legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds — all of which facilitate more terrorist attacks. “Terrorist organizations do not maintain organizational ‘firewalls’ that would prevent or deter . . . sharing and commingling of support and benefits.” McKune Affidavit, App. 135, ¶ 11. “[Ijnvestigators have revealed how terrorist groups systematically conceal their activities behind charitable, social, and political fronts.” M. Levitt, Hamas: Politics, Charity, and Terrorism in the Service of Jihad 2-3 (2006). “Indeed, some designated foreign terrorist organizations use social and political components to recruit personnel to carry *31 out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations.” MeKune Affidavit, App. 135, ¶ 11; Levitt, supra, at 2 (“Muddying the waters between its political activism, good works, and terrorist attacks, Hamas is able to use its overt political and charitable organizations as a financial and logistical support network for its terrorist operations”).
Money is fungible, and “[w]hen foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put.” MeKune Affidavit, App. 134, ¶ 9. But “there is reason to believe that foreign terrorist organizations do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations.” Id., at 135, ¶ 12. Thus, “[fjunds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives.” Id., at 134, ¶ 10. See also Brief for Anti-Defamation League as Amicus Curiae 19-29 (describing fundraising activities by the PKK, LTTE, and Hamas); Regan v. Wald, 468 U. S. 222, 243 (1984) (upholding President’s decision to impose travel ban to Cuba “to curtail the flow of hard currency to Cuba— currency that could then be used in support of Cuban adventurism”). There is evidence that the PKK and LTTE, in particular, have not “respected the line between humanitarian and violent activities.” MeKune Affidavit, App. 135, ¶ 13 (discussing PKK); see id., at 134 (LTTE).
The dissent argues that there is “no natural stopping place” for the proposition that aiding a foreign terrorist organization’s lawful activity promotes the terrorist organization as a whole. Post, at 49. But Congress has settled on just such a natural stopping place: The statute reaches only material support coordinated with or under the direction of a designated foreign terrorist organization. Independent *32 advocacy that might be viewed as promoting the group’s legitimacy is not covered. See supra, at 25-28.[6]
Providing foreign terrorist groups with material support in any form also furthers terrorism by straining the United States’ relationships with its allies and undermining cooperative efforts between nations to prevent terrorist attacks. We see no reason to question Congress’s finding that “international cooperation is required for an effective response to terrorism, as demonstrated by the numerous multilateral conventions in force providing universal prosecutive jurisdiction over persons involved in a variety of terrorist acts, including hostage taking, murder of an internationally protected person, and aircraft piracy and sabotage.” AEDPA § 301(a)(5), 110 Stat. 1247, note following 18 U. S. C. §2339B (Findings and Purpose). The material-support statute furthers this international effort by prohibiting aid for foreign terrorist groups that harm the United States’ partners abroad: “A number of designated foreign terrorist organizations have attacked moderate governments with which the United States has vigorously endeavored to maintain close and friendly relations,” and those attacks “threaten [the] social, economic and political stability” of such governments. McKune Affidavit, App. 137, ¶ 16. “[0]ther foreign terrorist organizations attack our NATO allies, thereby implicating important and sensitive multilateral security arrangements . ” Ibid.
For example, the Republic of Turkey — a fellow member of NATO — is defending itself against a violent insurgency *33 waged by the PKK. Brief for Government 6; App. 128. That nation and our other allies would react sharply to Americans furnishing material support to foreign groups like the PKK, and would hardly be mollified by the explanation that the support was meant only to further those groups’ “legitimate” activities. From Turkey’s perspective, there likely are no such activities. See 352 F. 3d, at 389 (observing that Turkey prohibits membership in the PKK and prosecutes those who provide support to that group, regardless of whether the support is directed to lawful activities).
C
In analyzing whether it is possible in practice to distinguish material support for a foreign terrorist group’s violent activities and its nonviolent activities, we do not rely exclusively on our own inferences drawn from the record evidence. We have before us an affidavit stating the Executive Branch’s conclusion on that question. The State Department informs us that “[t]he experience and analysis of the U. S. government agencies charged with combating terrorism strongly suppor[t]” Congress’s finding that all contributions to foreign terrorist organizations further their terrorism. McKune Affidavit, App. 133, ¶ 8. See Winter v. Natural Resources Defense Council, Inc., 555 U. S. 7, 24-25 (2008) (looking to similar affidavits to support according weight to national security claims). In the Executive’s view: “Given the purposes, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions — regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities.” McKune Affidavit, App. 133, ¶ 8.
That evaluation of the facts by the Executive, like Congress’s assessment, is entitled to deference. This litigation implicates sensitive and weighty interests of national secu *34 rity and foreign affairs. The PKK and LTTE have committed terrorist acts against American citizens abroad, and the material-support statute addresses acute foreign policy concerns involving relationships with our Nation’s allies. See id., at 128-133, 137. We have noted that “neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people.” Boumediene v. Bush, 553 U. S. 723, 797 (2008). It is vital in this context “not to substitute . . . our own evaluation of evidence for a reasonable evaluation by the Legislative Branch.” Rostker v. Goldberg, 453 U. S. 57, 68 (1981). See Wald, 468 U. S., at 242; Haig v. Agee, 453 U. S. 280, 292 (1981).
Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role. We do not defer to the Government’s reading of the First Amendment, even when such interests are at stake. We are one with the dissent that the Government’s “authority and expertise in these matters do not automatically trump the Court’s own obligation to secure the protection that the Constitution grants to individuals.” Post, at 61. But when it comes to collecting evidence and drawing factual inferences in this area, “the lack of competence on the part of the courts is marked,” Rostker, supra, at 65, and respect for the Government’s conclusions is appropriate.
One reason for that respect is that national security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess. The dissent slights these real constraints in demanding hard proof — with “detail,” “specific facts,” and “specific evidence” — that plaintiffs’ proposed activities will support terrorist attacks. See post, at 48, 55, 62. That would be a dangerous requirement. In this context, conclusions must often be based on informed judgment rather than *35 concrete evidence, and that reality affects what we may reasonably insist on from the Government. The material-support statute is, on its face, a preventive measure — it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur. The Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions. See Zemel, 381 U. S., at 17 (“[Bjecause of the changeable and explosive nature of contemporary international relations, . . . Congress . . . must of necessity paint with a brush broader than that it customarily wields in domestic areas”).
This context is different from that in decisions like Cohen. In that case, the application of the statute turned on the offensiveness of the speech at issue. Observing that “one man’s vulgarity is another’s lyric,” we invalidated Cohen’s conviction in part because we concluded that “governmental officials cannot make principled distinctions in this area.” 403 U. S., at 25. In this litigation, by contrast, Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not.
We also find it significant that Congress has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns. First, §2339B only applies to designated foreign terrorist organizations. There is, and always has been, a limited number of those organizations designated by the Executive Branch, see, e. g., 74 Fed. Reg. 29742 (2009); 62 Fed. Reg. 52650 (1997), and any groups so designated may seek judicial review of the designation. Second, in response to the lower courts’ holdings in this litigation, Congress added clarity to the statute by providing narrowing definitions of the terms “training,” “personnel,” and “expert advice or assistance,” as well as an explanation *36 of the knowledge required to violate § 2339B. Third, in effectuating its stated intent not to abridge First Amendment rights, see § 2339B(i), Congress has also displayed a careful balancing of interests in creating limited exceptions to the ban on material support. The definition of material support, for example, excludes medicine and religious materials. See § 2339A(b)(l). In this area perhaps more than any other, the Legislature’s superior capacity for weighing competing interests means that “we must be particularly careful not to substitute our judgment of what is desirable for that of Congress.” Rostker, supra, at 68. Finally, and most importantly, Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups.
At bottom, plaintiffs simply disagree with the considered judgment of Congress and the Executive that providing material support to a designated foreign terrorist organization — even seemingly benign support — bolsters the terrorist activities of that organization. That judgment, however, is entitled to significant weight, and we have persuasive evidence before us to sustain it. Given the sensitive interests in national security and foreign affairs at stake, the political branches have adequately substantiated their determination that, to serve the Government’s interest in preventing terrorism, it was necessary to prohibit providing material support in the form of training, expert advice, personnel, and services to foreign terrorist groups, even if the supporters meant to promote only the groups’ nonviolent ends.
We turn to the particular speech plaintiffs propose to undertake. First, plaintiffs propose to “train members of [the] PICK on how to use humanitarian and international law to peacefully resolve disputes.” 552 F. 3d, at 921, n. 1. Congress can, consistent with the First Amendment, prohibit this direct training. It is wholly foreseeable that the PKK could use the “specific skill[s]” that plaintiffs propose to *37 impart, § 2339A(b)(2), as part of a broader strategy to promote terrorism. The PKK could, for example, pursue peaceful negotiation as a means of buying time to recover from short-term setbacks, lulling opponents into complacency, and ultimately preparing for renewed attacks. See generally A. Marcus, Blood and Belief: The PKK and the Kurdish Fight for Independence 286-295 (2007) (describing the PKKs suspension of armed struggle and subsequent return to violence). A foreign terrorist organization introduced to the structures of the international legal system might use the information to threaten, manipulate, and disrupt. This possibility is real, not remote.
Second, plaintiffs propose to “teach PKK members how to petition various representative bodies such as the United Nations for relief.” 552. F. 3d, at 921, n. 1. The Government acts within First Amendment strictures in banning this proposed speech because it teaches the organization how to acquire “relief,” which plaintiffs never define with any specificity, and which could readily include monetary aid. See Brief for Plaintiffs 10-11, 16-17, n. 10; App. 58-59, 80-81. Indeed, earlier in this litigation, plaintiffs sought to teach the LTTE “to present claims for tsunami-related aid to mediators and international bodies,” 552 F. 3d, at 921, n. 1, which naturally included monetary relief. Money is fungible, supra, at 31, and Congress logically concluded that money a terrorist group such as the PKK obtains using the techniques plaintiffs propose to teach could be redirected to funding the group’s violent activities.
Finally, plaintiffs propose to “engage in political advocacy on behalf of Kurds who live in Turkey,” and “engage in political advocacy on behalf of Tamils who live in Sri Lanka.” 552 F. 3d, at 921, n. 1. As explained above, supra, at 25, plaintiffs do not specify their expected level of coordination with the PKK or LTTE or suggest what exactly their “advocacy” would consist of. Plaintiffs’ proposals are phrased at such a high level of generality that they cannot prevail in this *38 preenforcement challenge. See supra, at 25; Grange, 552 U. S., at 454; Zemel, 381 U. S., at 20.
In responding to the foregoing, the dissent fails to address the real dangers at stake. It instead considers only the possible benefits of plaintiffs’ proposed activities in the abstract. See post, at 52-54. The dissent seems unwilling to entertain the prospect that training and advising a designated foreign terrorist organization on how to take advantage of international entities might benefit that organization in a way that facilitates its terrorist activities. In the dissent’s world, such training is all to the good. Congress and the Executive, however, have concluded that we live in a different world: one in which the designated foreign terrorist organizations “are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.” AEDPA § 301(a)(7). One in which, for example, “the United Nations High Commissioner for Refugees was forced to close a Kurdish refugee camp in northern Iraq because the camp had come under the control of the PKK, and the PKK had failed to respect its 'neutral and humanitarian nature.’” McKune Affidavit, App. 135-136, ¶ 13. Training and advice on how to work with the United Nations could readily have helped the PKK in its efforts to use the United Nations camp as a base for terrorist activities.
If only good can come from training our adversaries in international dispute resolution, presumably it would have been unconstitutional to prevent American citizens from training the Japanese Government on using international organizations and mechanisms to resolve disputes during World War II. It would, under the dissent’s reasoning, have been contrary to our commitment to resolving disputes through “ 'deliberative forces,’ ” post, at 52 (quoting Whitney v. California, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring)), for Congress to conclude that assisting Japan on that front might facilitate its war effort more generally. That view is not one the First Amendment requires us to embrace.
*39 All this is not to say that any future applications of the material-support statute to speech or advocacy will survive First Amendment scrutiny. It is also not to say that any other statute relating to speech and terrorism would satisfy the First Amendment. In particular, we in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations. We also do not suggest that Congress could extend the same prohibition on material support at issue here to domestic organizations. We simply hold that, in prohibiting the particular forms of support that plaintiffs seek to provide to foreign terrorist groups, §2339B does not violate the freedom of speech.
VI
Plaintiffs’ final claim is that the material-support statute violates their freedom of association under the First Amendment. Plaintiffs argue that the statute criminalizes the mere fact of their associating with the PKK and LTTE, thereby running afoul of decisions like De Jonge v. Oregon, 299 U. S. 353 (1937), and cases in which we have overturned sanctions for joining the Communist Party, see, e. g., Keyishian v. Board of Regents of Univ. of State of N. Y, 385 U. S. 589 (1967); United States v. Robel, 389 U. S. 258 (1967).
The Court of Appeals correctly rejected this claim because the statute does not penalize mere association with a foreign terrorist organization. As the Ninth Circuit put it: “The statute does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group. . . . What [§ 2339B] prohibits is the act of giving material support . . . .” 205 F. 3d, at 1133. Plaintiffs want to do the latter. Our decisions scrutinizing penalties on simple association or assembly are therefore in-apposite. See, e. g., Robel, supra, at 262 (“It is precisely because th[e] statute sweeps indiscriminately across all types of association with Communist-action groups, without regard *40 to the quality and degree of membership, that it runs afoul of the First Amendment”); De Jonge, supra, at 362.
Plaintiffs also argue that the material-support statute burdens their freedom of association because it prevents them from providing support to designated foreign terrorist organizations, but not to other groups. See Brief for Plaintiffs 56; Reply Brief for Plaintiffs 37-38. Any burden on plaintiffs’ freedom of association in this regard is justified for the same reasons that we have denied plaintiffs’ free speech challenge. It would be strange if the Constitution permitted Congress to prohibit certain forms of speech that constitute material support, but did not permit Congress to prohibit that support only to particularly dangerous and lawless foreign organizations. Congress is not required to ban material support to every group or none at all.
^ ‡ ‡
The Preamble to the Constitution proclaims that the people of the United States ordained and established that charter of government in part to “provide for the common defence.” As Madison explained, “[sjecurity against foreign danger is ... an avowed and essential object of the American Union.” The Federalist No. 41, p. 269 (J. Cooke ed. 1961). We hold that, in regulating the particular forms of support that plaintiffs seek to provide to foreign terrorist organizations, Congress has pursued that objective consistent with the limitations of the First and Fifth Amendments.
The judgment of the United States Court of Appeals for the Ninth Circuit is affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

It is so ordered.

 In full, 18 U. S. C. § 2339B(a)(l) provides: “Unlawful conduct.— Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization..., that the organization has engaged or engages in terrorist activity..., or that the organization has engaged or engages in terrorism . . . .” The terms “terrorist activity” and “terrorism” are defined in 8 U. S. C. § 1182(a)(3)(B)(iii) and 22 U. S. C. § 2656f(d)(2), respectively.

 At the time plaintiffs first filed suit, 18 U. S. C. §2339B(a) (2000 ed.) provided: “Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both.” See Humanitarian Law Project v. Reno, 9 F. Supp. 2d 1205, 1207 (CD Cal. 1998). And 18 U. S. C. § 2339A(b) (2000 ed.) defined “material support or resources” to mean “currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons,' lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.”

 The dissent would interpret the statute along the same lines as the plaintiffs, to prohibit speech and association “only when the defendant knows or intends that those activities will assist the organization’s unlawful terrorist actions.” Post, at 56 (opinion of Breyer, J.). According to the dissent, this interpretation is “fairly possible” and adopting it would avoid constitutional concerns. Ibid, (internal quotation marks omitted). The dissent’s interpretation of § 2339B fails for essentially the same reasons as plaintiffs’. Congress explained what “knowingly” means in §2339B, and it did not choose the dissent’s interpretation of that term. In fact, the dissent proposes a mental-state requirement indistinguishable from the one Congress adopted in §§ 2339A and 2339C, even though Congress used markedly different language in § 2339B.

 The dissent also analyzes the statute as if it prohibited “[p]eaeeful political advocacy” or “pure speech and association,” without more. Post, at 48, 56. Section 2339B does not do that, and we do not address the constitutionality of any such prohibitions. The dissent’s claim that our decision is inconsistent with this Court’s cases analyzing those sorts of restrictions, post, at 50-51, is accordingly unfounded.

 The Government suggests in passing that, to the extent plaintiffs’ activities constitute speech, that speech is wholly unprotected by the First Amendment. The Government briefly analogizes speech coordinated with foreign terrorist organizations to speech effecting a crime, like the words that constitute a conspiracy. Brief for Government 46; Reply Brief for Government 31-32, and n. 8. See, e. g., Giboney v. Empire Storage & Ice Co., 336 U. S. 490, 498, 502 (1949). We do not consider any such argument because the Government does not develop it: The Government’s submission is that applying § 2339B to plaintiffs triggers intermediate First Amendment scrutiny — not that it triggers no First Amendment scrutiny at all.

 The dissent also contends that the particular sort of material support plaintiffs seek to provide cannot be diverted to terrorist activities, in the same direct way as funds or goods. Post, at 47-48. This contention misses the point. Both common sense and the evidence submitted by the Government make clear that material support of a terrorist group’s lawful activities facilitates the group’s ability to attract “funds,” “financing,” and “goods” that will further its terrorist acts. See McKune Affidavit, App. 134-136.